IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 9, 2002 Session

# EDWARD PAUL SILVA v. ALBERT W. BUCKLEY, JR.

**Appeal from the Chancery Court for Williamson County**
**No. 27884   Russ Heldman, Judge**

_____

_____No. M2002-00045-COA-R3-CV - Filed December 31, 2003
_____

This is a dispute between an attorney and his client over the attorney's fee.  The trial judge held that the parties agreed that the attorney would be entitled to an enhanced fee if he obtained a good result in the client's divorce.  We affirm that interpretation of the agreement and the amount set by the trial judge as reasonable fee.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed**

BEN H. CANTRELL, P.J., M.S.., delivered the opinion of the court in which W. MICHAEL MALOAN, SP. J., joined.  PATRICIA J. COTTRELL, J. filed a dissenting opinion.

Robert L. DeLaney, Nashville, Tennessee, for the appellant, Albert W. Buckley, Jr.

P. Edward Schell, Franklin, Tennessee, and John D. Kitch, Nashville, Tennessee, for the appellee, Edward Paul Silva.

## OPINION

### I.
### ATTORNEY-CLIENT CONTRACT

Mr. Buckley, the client, employed Mr. Silva to represent him in a divorce.  The stakes were fairly high, due to Mr. Buckley's personal holdings, and Mr. Silva drafted an agreement to govern how he was to be paid for his services.  As pertinent here, the agreement provided:

> This letter will confirm the basis upon which we have agreed to represent your interests in the above-referenced matter.  We will bill you for our services on account on an hourly rate basis.  The current hourly fee for my time is $185.00, and the hourly fee for paralegal time is $60.00.  Hourly billing will be to the tenth (1/10th)

of an hour. Your ultimate fee may vary depending on the time limitations imposed by you, the time and labor required, the novelty and difficulty of the questions involved, the skill requisite to perform the legal service properly, or the amount involved and the results obtained. Accounts are due and payable, in full, within 30 days of the final billing and are subject to a monthly service charge of 1.5% of any balance outstanding after 30 days.

A critical part of the case was an antenuptial agreement signed by Mrs. Buckley. Her lawyer attacked the agreement on the grounds of duress and lack of full disclosure, but Mr. Silva persuaded the Court that the agreement should be enforced according to its terms. Mrs. Buckley, therefore, received only $200,000.00 in marital assets and $150,000.00 in alimony, where Mr. Buckley's personal estate had increased approximately $18,000,000.00 during the marriage.

Mr. Silva billed Mr. Buckley a total of $57,920.57 as the trial progressed. At a meeting in December of 2000 to go over the final judgment, Mr. Silva told Mr. Buckley that they needed to discuss the final bill. Several weeks later they met, and Mr. Silva said that based on the fee agreement he thought a total fee of $150,000.00 to $175,000.00 was reasonable. Mr. Buckley was "nonplussed," according to Mr. Silva, and asked for a chance to think about the proposal. Ultimately, Mr. Buckley refused to pay anything more than he had already paid and this lawsuit followed.

The trial judge held that Mr. Buckley "knew, should have known or at least had reason to know" that the agreement provided for a fee in addition to Mr. Silva's customary hourly fee. The court noted that the "ultimate fee" provision in the contract could only mean "the entire fee charged after the entire divorce case has concluded or ended."

Mr. Buckley contends on appeal that he understood the "result fee" portion of the contract to mean that the ultimate fee would depend on how many hours Mr. Silva had to spend on the case; and that the number of hours would vary depending on the factors set out in the agreement (the novelty and difficulty of the questions, the skill requisite to perform the service, etc.).

Our review is *de novo* on the record. As to factual matters we presume the judgment is correct unless the evidence preponderates against it. Tenn. R. App. Proc. 13(d); *Limbaugh v. Coffee Co. Med. Ctr.,* 59 S.W. 3d 73 (Tenn. 2001). We review questions of law, *de novo*, without the presumption of correctness. *Kline v. Eyrick,* 69 S.W. 3d 197 (Tenn. 2002).

## II.
## RULES REGARDING THE INTERPRETATION OF ATTORNEY-CLIENT CONTRACTS

The interpretation of a written agreement is a question of law for the Court: *Doe v. HCA Health Services of Tennessee,* 46 S.W. 3d 191 (Tenn. 2001). The Court's primary purpose is to find what the parties intended. *Ohio Cas. Co., Inc. v. Travelers Indemnity Co.*, 493 S.W. 2d 465 (Tenn.

1973).  When the language of a contract is plain and unambiguous, the court must determine the parties' intention from the four corners of the writing.  *Simonton v. Huff,* 60 S.W. 3d 820 (Tenn. Ct. App. 2000).  But as an aid to finding that intention, the court may consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms.  *id.* at 825.  Proof of that nature does not violate the parol evidence rule. See *Coble Systems, Inc. v. Gifford,* 627 S.W. 2d 359 (Tenn. Ct. App. 1981).  These general rules of contract law also apply to contracts between attorneys and clients.  *Alexander v. Inman,* 903 S.W. 2d 686 (Tenn. Ct. App. 1995). (Alexander I)

An attorney-client agreement, however, is subject to a higher level of scrutiny by the courts. Attorneys must deal with their clients in utmost good faith.  *Alexander v. Inman,* 974 S.W. 2d 689 at 694 (Tenn. 1998). (Alexander II) "This level of good faith is significantly higher than that required in other business transactions where the parties are dealing at arm's length."  *id.*  Therefore, in order to enforce a contract with a client an attorney must demonstrate:

(1)    that he or she provided the client with the same information and advice that the attorney would have provided the client had he or she not been personally interested in the transaction;
(2)    that the client fully understood the meaning and effect of the contract;
(3)    that the client's understanding of the contract was the same as the attorney's; and
(4)    that the contract is just and reasonable.

*Alexander I,* 903 S.W. 2d at 694.

Courts have imposed these conditions on attorneys in order to protect the client from any hint of unfairness or misunderstanding.  But the high burden of proof placed on attorneys does not give clients an automatic escape from the contract by simply saying that their understanding of the agreement differed from the attorney's.  The Supreme Court in Alexander II said, "The argument that a fee agreement is unenforceable unless verbally explained to the client would effectively create a presumption that all attorney's fee contracts are unenforceable . . .we do not find such a presumption appropriate."  *Alexander II*, 974, S.W. 2d at 695.  After analyzing the facts in the record showing the circumstances surrounding the transaction, especially the client's acumen and her experience as a businesswoman, the Court said "we discern no plausible basis for concluding that [the client] did not understand [the terms of the agreement]."  *id.* at 694.

We think that Alexander I, and Alexander II establish at a minimum that the client must fully understand the contract's meaning and effect.  If the agreement is clear and unambiguous the burden is on the client to show that the client did not have the same understanding as the attorney. Alexander II.  A simple denial by the client is not sufficient.  *id.*  We think it follows that if the contract is not clear and unambiguous the burden is on the attorney to show that the client did understand it.

## III.
## THE CONTRACT IN QUESTION

If the agreement had stopped after the first four sentences, there would have been no question about the amount of the fee. Up to that point the agreement describes a straight hourly fee. The next sentence, however, introduces another idea: "Your ultimate fee may vary depending on the time limitations imposed by you, the time and labor required, the novelty and difficulty of the questions involved, the skill requisite to perform the legal service properly, or the amount involved and the results obtained."

We do not think that a sophisticated and intelligent businessman would read that sentence as simply a restatement of the first four sentences. We are not as confident as the trial judge that the entire agreement is crystal clear, but when the "ultimate fee" is made to depend on "the amount involved and the result obtained," that expression must mean something more than a straight hourly fee.

But even if the sentence were clear to us, this being an attorney-client contract, we would not enforce that provision against Mr. Buckley unless we could find that he did in fact understand it. See *Alexander I*, 903 S.W. 2d at 694; *Alexander II*, 974 S.W. 2d at 694. On this point, Mr. Silva testified that he had given the contract to Mr. Buckley on May 18, 1998. Mr. Buckley came to Mr. Silva's office on August 19 to prepare an answer to the complaint. He signed the agreement on that day, and Mr. Silva testified that he explained to Mr. Buckley how the final fee would be determined. He explained that the Supreme Court had established certain factors to be considered and had set those factors out in the Disciplinary Rules for lawyers; that the final fee could not be ascertained until the case was over when they would sit down and discuss the fee based on all the factors.

Mr. Buckley testified that Mr. Silva told him that he could only charge $185.00 per hour. He testified further that when he signed the engagement letter on August 19, 1998 Mr. Silva put it in the file and that was it. The first time Mr. Buckley learned that he would be charged a "tail end" fee, as he put it, was in December of 2000.

At the close of the proof the trial judge complimented Mr. Silva and Mr. Buckley for their truthfulness, but in a memorandum filed later, the court stated:

> In making the aforementioned findings, the Court notes that both Mr. Silva and Mr. Buckley appeared to be credible witnesses at trial. However, upon thoughtful consideration of their appearance as witnesses in light of all the evidence, the Court finds that Mr. Buckley was not credible on one following point: that he did not reasonably anticipate or expect that he would ever owe Mr. Silva more than a mere $185 per hour for all of Mr. Silva's services rendered under their agreement. Mr. Buckley knew, should have known or at least had reason to know that his final or ultimate fee may very well exceed

4

$185 per hour of Mr. Silva's time once the case was concluded and all the factors had been considered and applied.

We think the trial judge's memorandum amounts to a finding that Mr. Buckley did, in fact, understand that his ultimate obligation on Mr. Silva's fee would depend on the other factors set out in the agreement and not simply on the hourly rate. A trial judge's determination of the facts based on the credibility of the witness is binding on the reviewing court unless other real evidence compels a contrary conclusion. *State ex. rel. Balsinger v. Town of Madisonville,* 435 S.W. 2d 803 (Tenn. 1968). See also *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W. 2d (Tenn. Ct. App. 1975). We think the question of whether Mr. Buckley understood the agreement turns entirely on the credibility of the witnesses. Without other real evidence in the record to compel a contrary conclusion, we affirm the trial judge's finding on that issue.

We acknowledge that one of the rules of contract construction says that an ambiguous contract should be construed most strongly against the drafter, *Alexander I,* 903 S.W. 2d at 694, There is also authority for a double- barreled application of this rule when the contract is between a lawyer and client. *Beatty v. NP Corp.,* 58I NE2d 1311 (Mass. App. Ct. 1999). But we have also said that this rule should be invoked only when all other rules of construction fail. See *Coble Systems, Inc. v. Gifford Co.,* 627 S.W. 2d 359 (Tn. Ct. App. 1981). Where the intent of the parties can be ascertained by other means, this rule should not be mechanically applied to negate that intent. *id.*

## IV.
## THE FEES

Mr. Silva offered the opinion of an attorney with extensive experience in trying high-profile divorce cases. He said that a reasonable fee based on the factors set out in the engagement letter would be $200,000.00. The court found that Mr. Buckley should pay a total fee of $175,000.00. This finding is entitled to the presumption of correctness set forth in 13(d) Tenn. R. App. Proc. We cannot say that the evidence preponderates against it.

The judgment of the court below is affirmed and the cause is remanded to the Chancery Court of Williamson County for any further proceedings that may be necessary. Tax the costs on appeal to the Appellant, Albert W. Buckley, Jr.

_____
BEN H. CANTRELL, P.J., M.S.