IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 5, 2002 Session

## RONALD E. BROWN v. BALATON POWER, INC.

**Appeal from the Chancery Court for Williamson County**
**No. 27720      Russ Heldman, Chancellor**

_____

**No. M2001-02770-COA-R3-CV - Filed December 31, 2003**
_____

This case involves the issue of whether parties contracted for arbitration to be the sole method of dispute resolution with regard to contract disputes. We find the intent of the parties unclear due to an irreconcilable conflict between two sections of the contract dealing with dispute resolution. We, thus, affirm the trial court's ruling that Plaintiff cannot be compelled to arbitrate.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., and ELLEN HOBBS LYLE, SP. J., joined.

A. Russell Willis, William B. Hawkins, Nashville, Tennessee; John W. Elwick, Vancouver, British Columbia, for the appellant, Balaton Power, Inc.

William L. Harbison, L. Webb Campbell, Ryan A. Rafoth, Nashville, Tennessee, for the appellee, Ronald E. Brown.

### OPINION

Balaton Power, Inc. ("Balaton") is a Canadian power company incorporated and headquartered in Vancouver, British Columbia, with a field office located in Boise, Idaho. From August of 2000 to February of 2001, Balaton maintained an administrative/marketing office in Franklin, Tennessee.[1] Balaton hired Ronald E. Brown as the President and CEO of the Franklin office and signed an employment contract to that effect on July 27, 2000. The employment contract contained an arbitration clause, which is the central issue on appeal.

---

[1] The parties agreed that United States Federal law and Tennessee law would govern the arbitration issue presented in this appeal.

On December 5, 2000, Mr. Brown submitted a letter of resignation from his position as President and CEO. At that time, Mr. Brown exercised the option in his employment contract to be appointed Senior Vice-President of Marketing for Balaton. He continued working in that position until February 12, 2001. On that date, Balaton informed Mr. Brown by a letter written by Rodney E. Smith, President of Balaton, of his immediate suspension without pay.

Between February 12, 2001, and April 27, 2001, Balaton investigated several allegations against Mr. Brown. In a letter dated April 27, 2001, Balaton terminated the employment agreement with Mr. Brown. That letter stated that, while the investigation was ongoing, the "preliminary results are such that the company now exercises its right to terminate the Employment Agreement and your services for just cause." The termination was effective as of February 12, 2001. Mr. Brown then filed suit against Balaton for breach of the employment agreement alleging that he had been wrongfully terminated and deprived of salary, benefits, and stock options.

The trial court entered an Order directing the parties to submit the cause to a mediator. Mr. Brown sought a default judgment, based upon Balaton's failure to answer the Complaint. Balaton responded and filed the Affidavit of the President and Director, Rodney Smith. Their response argued that default judgments were unfavored, particularly when the defendant demonstrates a meritorious defense to the complaint. Balaton answered the Complaint soon thereafter and argued that Mr. Brown failed to state a claim upon which relief could be granted and that the trial court lacked jurisdiction over the action as the Employment Agreement mandated arbitration in accordance with the laws of British Columbia, Canada. Balaton then filed a Motion to Dismiss arguing that the employment agreement stipulated that all disputes were to be arbitrated and, therefore, the trial court lacked jurisdiction.

The trial court entered a scheduling order directing the parties to comply with the court's previous Order of mediation, setting the date for discovery completion, and setting February 6, 2002, as the date for trial. The trial court denied the Defendant's Motion to Dismiss on October 2, 2001, that Order stating:

> The Court finds that the Employment Contract in this matter contemplates in Section 8.1 the filing of a complaint in "a court of competent jurisdiction," that the Chancery Court for Williamson County, Tennessee has jurisdiction over the parties and the subject matter of this case, and that there is no requirement that the case be brought in British Columbia as urged by the Defendant.

On October 5, 2001, Balaton filed a Motion to Compel Arbitration, based upon the argument that "[m]ediation is not the agreed upon means for the resolution of this dispute and is not likely to be successful" and that "[t]he parties to this contract intended for any dispute to be arbitrated according to the laws of British Columbia."

On October 22, 2001, the trial court heard Balaton's Motion to Compel Arbitration. The trial court denied the Motion to Compel Arbitration, finding that "the inconsistencies between paragraphs

2

8.1 and 8.2 of the employment agreement cannot be reconciled." Balaton also orally requested an interlocutory appeal on the issue of whether Mr. Brown can be compelled to arbitrate this dispute.

On November 20, 2001, Mr. Brown filed a Motion to Dismiss the Appeal with this Court. Balaton responded by filing its Motion for Clarification on November 21, 2001, seeking a determination as to whether it should proceed with the appeal under Tennessee Rule of Appellate Procedure 3 or 9. This Court denied the Motion to Dismiss the Appeal on January 7, 2002, and clarified that the appeal was allowed under Rule 3 by Tennessee Code Annotated section 29-5-319. This Court stayed all proceedings in the trial court, including discovery, during the pendency of the appeal.

On appeal, Balaton argued that the parties anticipated arbitration to be the method by which disputes arising from the employment agreement would be resolved and that the question of whether arbitration is the proper method should be determined by applying the law of the Tennessee Uniform Arbitration Act, section 29-5-301 to 320 of the Tennessee Code, and the Federal Arbitration Act, 9 U.S.C. § 2. Mr. Brown, on the other hand, argued that, due to the conflicting language in the Employment Agreement that was drafted by Balaton, the trial court correctly held that Brown could not be compelled to arbitrate the dispute. He also argued that Balaton waived its right to arbitrate the dispute as a result of its actions which were inconsistent with an intent to arbitrate.

## I. The Employment Agreement

The employment contract at issue herein contains an arbitration clause, construction of which is the primary issue on appeal. The pertinent section at issue states:

8.      Governing Law

8.1     This agreement shall be governed by and construed in accordance with the laws of the Province of British Columbia, Canada or in such jurisdiction wherein the Company's Registered Head Office is located if the Company decides to relocate said Registered Head Office and any action or proceeding in respect of it or alleging a breach of it will be commenced and maintained only in a court of appropriate jurisdiction.

8.2     Any dispute, controversy or claim arising out of or relating to this agreement or the breach of it shall be settled by arbitration in accordance with the laws of the Province of British Columbia, Canada or other appropriate jurisdiction per 8.1 above and, unless the parties agree to refer the same to a single arbitrator, shall be referred to two arbitrators, one to be chosen by each of the parties and the arbitrators shall, before entering on the reference, appoint an umpire.

There is no question that, if the parties made an agreement to arbitrate, that agreement must

3

be enforced by this Court. The issue is, however, whether the above cited paragraphs, together, show that the parties intended arbitration to be the sole required method of contract resolution.

> Because the contract in this case is one that involves interstate commerce, the [Federal Arbitration Act] applies to ensure that the arbitration agreement between the parties is enforced according to its terms. . . .

> The purpose of the FAA is "to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57, 131 L.Ed.2d 76, 115 S.Ct. 1212 (1995); *Volt Info. Sciences, Inc.*, 489 U.S. at 476, 109 S.Ct. 1248. However, parties cannot be forced to arbitrate claims that they did not agree to arbitrate. As the United States Supreme Court has stated,
>> Arbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted.
> *Volt Info. Sciences, Inc.*, 489 U.S. at 479, 109 S.Ct.1248 (citations omitted).

> The FAA's "proarbitration policy does not operate without regard to the wishes of the contracting parties." *Mastrobuono*, 514 U.S. at 57, 115 S.Ct. 1212. Because "arbitration is a matter of contract[,] . . . a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 89 L.Ed.2d 648, 106 S.Ct. 1415 (1986). When parties agree to arbitration, the FAA ensures enforcement of that agreement by withdrawing "the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp.*, 465 U.S. at 10, 104 S.Ct. 852. However, consistent with the FAA, parties may agree that only certain issues will be submitted to arbitration or that they will not arbitrate at all. Cf. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 87 L.Ed.2d 444, 105 S.Ct. 3346 (1985).

> Therefore, the question essentially becomes "what the contract has to say about the arbitrability of petitioner's claim . . . ." *Mastrobuono*, 514 U.S. at 58.

*Frizzell Const. Co., Inc. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 83-4 (Tenn.1999).

The question of whether parties intended the contract to require arbitration is clearly one to be decided by the court.

> The first principle gleaned from the *Trilogy* is that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he

4

has not agreed so to submit." *Warrior & Gulf, supra*, at 582; *American Mfg. Co., supra*, at 570-571 (BRENNAN, J., concurring). This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration. *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 374 (1974).

The second rule which follows inexorably from the first, is that the question of arbitrability - - whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance - - is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator. *Warrior & Gulf, supra*, at 582-583. *See Operating Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 491 (1972); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241 (1962), overruled in part on other grounds, *Boys Markets, Inc. v. Retail Clerks*, 398 U.S. 235 (1970). Accord, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

The Court expressly reaffirmed this principle in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964). The "threshold question" there was whether the court or an arbitrator should decide if arbitration provisions in a collective-bargaining contract survived a corporate merger so as to bind the surviving corporation. *Id.*, at 546. The Court answered that there was "no doubt" that this question was for the courts. "'Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties.' . . . The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty." *Id.*, at 546-547 (citations omitted).

*AT&T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 648-49 (1986).

Further, we review this issue *de novo*, with no presumption of correctness.

There are no factual disputes on appeal; the interpretation of the arbitration clause of the contract is a question of law. *Rapp Constr. Co. v. Jay Realty Co.*, 809 S.W.2d 490, 491 (Tenn.App.1991). Therefore our review of the judgment below is *de novo* upon the record with no presumption of correctness of the trial court's conclusion of law. Tenn. R. App. P. 13(d); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995).

*In Re: Estate of Wyatt*, No. 02A01-9706-PB-00132, 1998 WL 477668, at *2 (Tenn.Ct.App.1998).

A party cannot be required to arbitrate unless arbitration was the exclusive remedy for which the parties contracted. In this determination we turn to ordinary rules of contract construction.

5

Courts should generally apply "ordinary state-law principles" in deciding whether the parties agreed to submit certain issues to arbitration. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 131 L.Ed.2d 985, 115 S.Ct. 1920 (1995) (citing *Mastrobuono*, 514 U.S. at 62-63, 115 S.Ct. 1212). Under Tennessee law, the law governing this contract, the "cardinal rule [in interpreting contracts] . . . is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Bob Pearsall Motors, Inc. v. Regal Chrysler - - Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn.1975). Courts may determine the intention of the parties "by a fair construction of the terms and provisions of the contract, by the subject matter to which it has reference, by the circumstances of the particular transaction giving rise to the question, and by the construction placed on the agreement by the parties in carrying out its terms." *Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn.19909). No single clause in a contract is to be viewed in isolation; rather, the contract is to be "viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another." *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn.1985).

*Frizzell Constr.*, 9 S.W.3d at 85. These rules of construction are further elaborated in *Coble Systems, Inc. v. Gifford Co.*, 627 S.W.2d 359 (Tenn.Ct.App.1981).

From the four corners of the agreement then, what did the parties intend when this agreement was executed? There are other rules of construction that can be applied to help resolve the apparent conflict. First and most important is the primary rule that the intent of the parties must prevail. *Ohio Cas. Co., Inc. v. Travelers Indemnity Company*, 493 S.W.2d 465 (Tenn.1973). Second, the courts will construe the writing so as to avoid the conflict if possible. *Bartlett v. Phillips - Carey Mfg. Co.*, 216 Tenn. 323, 392 S.W.2d 325 (1965). Third, if the provisions are so repugnant that they cannot stand together, the first shall be given effect and the latter rejected. 17 Am.Jur.2d Contracts, § 267; *Bartlett v. Phillips-Cary Mfg. Co., supra*; *Smithart v. John Hancock Mut. Life Insurance Company*, 167 Tenn. 513, 71 S.W.2d 1059 (1934). Fourth, written or typewritten terms will control printed parts of an agreement where there is an apparent inconsistency. 17 Am.Jur.2d Contracts, § 271; *Tindell v. Bowers*, 31 Tenn.App. 474, 216 S.W.2d 752 (1949). Fifth, doubtful language in a contract should be interpreted most strongly against the party who drew or prepared it. 17 A.Jur.2d *Contracts*, § 276. This last rule is to be applied, however, only where other rules of construction fail to give certainty to the written expression. 17 Am.Jur.2d Contracts, § 276; *Crouch v. Shepard*, 44 Tenn. 383 (1867).

*Coble Systems*, 627 S.W.2d at 363. It should also be remembered that courts are precluded from creating contracts for the parties. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn.1975).

6

In reviewing this contract and the language of the "Governing Laws" section that is alleged to contain an arbitration agreement, we cannot say this language constitutes an agreement to arbitrate as the sole method of dispute resolution. The section is ambiguous and the intent of the parties is not clear from reading the language as written. Section 8.1 contemplates a cause of action for breach of the agreement being "commenced and maintained only in a court of appropriate jurisdiction." Section 8.2 requires arbitration in the same appropriate jurisdiction set out in 8.1. Numerous cases from other states cited by Balaton Power have harmonized a choice of law provision with an arbitration clause in the same contract. However, none of those cases contain the mandatory "commenced and maintained" language in the contract at issue. The language of section 8.1 provides that a legal action for breach "will be commenced and maintained" in a court of law. The conflict between these two sections is unavoidable. Except through a strained reading that ignores or avoids words, the two sections cannot be reconciled.

Due to the unresolvable ambiguity of the language and Tennessee's rules of contract interpretation, "the first section should be given effect and the latter rejected." *Coble Systems*, 627 S.W.2d at 363. As such, the trial court was correct in rejecting Balaton's Motion to Compel Arbitration. We find no contractual agreement between the parties giving up their right to redress in a court of law.

Mr. Brown also argued that Balaton Poiwer had waived its right to arbitration. However, as we find that Balaton has no right to arbitration, that issue is moot.

The ruling of the trial court is affirmed.

---

WILLIAM B. CAIN, JUDGE

7